1   DAVID S. McLANE (No. 124952)
    KAYE, McLANE & BEDNARSKI, LLP
2   234 East Colorado Boulevard, Suite 230
    Pasadena, California 91101
3   Telephone: (626) 844-7660
    Facsimile: (626) 844-7670
4   E-Mail: dmclane@kmbllp.com

5   Attorneys for Plaintiff
    REINA MARIBEL CAMPOS

6   BRIAN A. VOGEL, SBN 167493
    brian@bvogel.com
7   THE LAW OFFICES OF BRIAN A.VOGEL, PC
    770 County Square Dr., Ste. 104
8   Ventura, CA 93003
    Telephone: (805) 654-0400
9   Facsimile: (805) 654-0326

10  Attorneys for Plaintiff
    BLANCA CARDENAS

11

12

13                  **UNITED STATES DISTRICT COURT**

14                  **CENTRAL DISTRICT OF CALIFORNIA**

15                        **WESTERN DIVISION**

16  REINA MARIBEL CAMPOS,              )  CASE NO. CV 11-09613-DDP(PJWx)
    INDIVIDUALLY, AND                  )
17  SUCCESSOR IN INTEREST TO           )  **SECOND AMENDED**
    STEVE ULYSSES CABRERA,             )  **COMPLAINT FOR DAMAGES**
18  BLANCA CARDENAS,                   )
    INDIVIDUALLY, AND SUCCESSOR        )  **1) Violation of Civil Rights, 42 U.S.C.**
19  IN INTEREST TO STEVE ULYSSES       )  **§ 1983 - - Wrongful Death;**
    CABRERA,                           )  **2) Violation of Civil Rights, 42 U.S.C.**
20                                     )  **§ 1983 - - Failure to Train, Supervise**
               Plaintiffs,            )  **Causing Constitutional Violation;**
21                                     )  **3) Violation of Civil Rights, 42 U.S.C.**
    v.                                 )  **§ 1983, Supervisory Liability;**
22                                     )  **4) General Negligence;**
    COUNTY OF LOS ANGELES; LOS         )  **5) Violation of Cal Govt. Code § 845.6**
23  ANGELES COUNTY SHERIFF'S           )  **- - Failure to Provide Immediate**
    DEPARTMENT; SHERIFF LEE            )  **Medical Care; and,**
24  BACA; and DOES 1 through 10,       )  **6) Violation of Cal. Govt. Code §**
    inclusive,                         )  **844.6, negligence;**
25                                     )  **7) Violation of Mandatory Duty, Cal.**
               Defendants.            )  **Gov't. Code § 815.6.**
26  _____)

27                                        **[DEMAND FOR JURY TRIAL]**

28

**JURISDICTION**

1. Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983, 1988 and state law. The Court has jurisdiction over the federal law claims action pursuant to 28 U.S.C. §§ 1331 and 1343. The state law claims for relief are within the supplemental jurisdiction of the Court, pursuant to 28 U.S.C. § 1367.

**VENUE**

2. Venue in the Central District of California is proper as Steve Ulysses CABRERA, the decedent, was a detainee at Los Angeles County's Men's Central Jail, within the Central District of California; one or more of the Defendants' principal place of business is in the County of Los Angeles; and the events giving rise to the claim occurred within the Central District of California. 28 U.S.C. § 1391(a)(1) and (b)(2).

3. A Claim in accordance with California Government Code § 910 *et seq.*, was filed with the State of California on April 4, 2011, within six months of Mr. CABRERA's death on October 5, 2010. The claim was rejected on May 19, 2011, and this action is timely filed.

**PARTIES**

4. Plaintiff REINA MARIBEL CAMPOS is the mother and successor in interest and an heir at law of STEVE ULYSSES CABRERA (hereinafter referred to as "STEVE CABRERA" or "Mr. CABRERA"), the deceased. She brings this suit pursuant to California Code of Civil Procedure §§ 377.30 and 377.60 for herself, individually, and as the successor in interest and personal representative of the estate of STEVE CABRERA.

5. Plaintiff BLANCA CARDENAS was married to STEVE CABRERA at the time of his death, and is a successor in interest and an heir at law of STEVE

CABRERA, the deceased.  She brings this suit pursuant to California Code of Civil Procedure §§ 377.30 and 377.60 for herself, individually, and as the successor in interest and personal representative of the estate of STEVE CABRERA.

6.    Defendant Sheriff Lee Baca (hereinafter referred to as "SHERIFF BACA") is and was at all times mentioned herein, the Sheriff for Los Angeles County and in charge of Men's Central Jail ("MCJ") in Los Angeles County, the facility where STEVE CABRERA resided at the time of his death.  SHERIFF BACA has been Sheriff of Los Angeles County since 1998.  By California law, the Sheriff is answerable for the safekeeping of inmates in his custody.  Cal. Gov't Code §§ 26605, 26610; Cal. Pen. Code ¶ 4006.  SHERIFF BACA is responsible for the management and control of all Los Angeles County Jails, was responsible for the administration of MCJ; for the selection, promotion, supervision, training, discipline and retention of agents and employees working within the MCJ, including custodial staff, counselors, advisors, nurses, doctors, physician assistants, medical staff, mental health staff, education staff, and supervisors; and for the implementation of policies and procedures at MCJ.  He is responsible for the care, custody and control of all inmates housed in MCJ.  Sheriff Baca is regularly provided with reports concerning allegations of overcrowding and improper housing of inmates, including mentally ill inmates, improper classification of inmates in the jails, jail suicides, allegations of excessive force, and other violations involving the housing, care, mental health care, and treatment of inmates at MCJ.  Pursuant to California law and his duties as the Sheriff of Los Angeles County, SHERIFF BACA is sued in his individual capacity, as a supervisor for his own culpable action or inaction in the training, supervision or control of his subordinates, or his acquiescence in the constitutional deprivations which this Second Amended Complaint alleges, or for conduct that showed reckless or

callous indifference for others. Sheriff Baca's affirmative conduct involves his knowing failure to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which he knew or reasonably should have known would cause others to inflict a constitutional injury on Mr. CABRERA.

7.    At all times mentioned herein Defendants COUNTY OF LOS ANGELES ("COUNTY"), and the LOS ANGELES COUNTY SHERIFF'S DEPARTMENT ("LACSD") were public entities and municipal corporations, duly organized and existing under and by virtue of the laws of the State of California.

8.    Plaintiffs are informed and believes and thereon alleges that Defendants sued herein as DOES 1- 10, inclusive, are custody staff, counselors, nurses, doctors, assistants, agents and/or employees of Defendants COUNTY and LACSD and were at all relevant times acting in the course and scope of their employment and agency.  DOE DEFENDANTS are referred to herein as DOE Medical Staff, DOE Custodial Staff, DOE Supervisors, etc., as appropriate. Plaintiffs allege that each of the Defendants named as a DOE was in some manner responsible for the acts and omissions alleged herein, and Plaintiffs will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained through the discovery process.

9.    At all times mentioned herein Defendants SHERIFF BACA, and DOES 1-10, were residents of the County of Los Angeles, State of California, and were supervisors, peace officers, sergeants, captains, lieutenants, detectives, commanders, sheriff, custody staff, counselors, nurses, doctors, assistants, agents and/or employees of the COUNTY and LACSD, as well as employees, agents and representatives of said Defendants. Each Defendant is the agent of the other Defendants.

**PRELIMINARY ALLEGATIONS**

10. This action is brought under 42 U.S.C. § 1983 and on the Fourteenth and
Eighth Amendments of the United States Constitution, and pursuant to the
general laws of the United States and of the State of California.  Plaintiffs
allege that the conduct of each Defendant deprived STEVE CABRERA of his
constitutional and statutory rights, and their conduct resulted in the
termination of his life in violation of his Fifth, Fourteenth, and Eighth
Amendment rights.

11. Each of the Defendants, including DOE Defendants, caused and is responsible
for the unlawful conduct and resulting injury by, *inter alia*, personally
participating in the conduct; acting jointly and in concert with others' conduct;
authorizing, acquiescing or failing to take action to prevent the unlawful
conduct; promulgating policies and procedures or practices pursuant to which
the unlawful conduct occurred; failing and refusing to initiate and maintain
adequate training, supervision, policies, procedures and protocols; failing to
implement and ensure compliance with policies and procedures to ensure the
safety and reasonable security of detainees at MCJ, such as STEVE
CABRERA; and/or ratifying the unlawful conduct performed by agents,
employees, counselors, staff, and officers under their direction and control.

12. Whenever and wherever reference is made in this Complaint to any act by a
Defendant, such allegation and reference will also be deemed to mean the acts
and failures to act of each Defendant individually, jointly or severally.

**FACTUAL ALLEGATIONS DEMONSTRATING DELIBERATE
INDIFFERENCE TO CLASSIFICATION AND MENTAL HEALTH NEEDS
OF INMATES BY MEDICAL STAFF, CUSTODY STAFF, JAIL
SUPERVISORY STAFF AND SHERIFF BACA**

-5-

13.   SHERIFF BACA is sued in his individual capacity for his own culpable action or inaction in the training, supervision, or control o f his subordinates, including the facility commanders, the watch commander, the floor sergeants, and/or for his "acquiescence in the constitutional deprivations as alleged herein, and/or conduct that showed a reckless or callous indifference to the rights of [inmates such as Plaintiff], by his actions or inaction in implementation or lack thereof of policies, procedures, rules or directives. *See Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir. 1998); *Starr v. Baca*, 652 F.3d 1202, 1207-08 (2011).   SHERIFF BACA's actions and/or inactions, set in motion a series of acts by others (as provided below), or he failed to terminate a series of actions by others, which he knew or reasonably should have known, would cause others to inflict the constitutional violations alleged herein. *See Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001);   *Starr v. Baca*, 652 F.3d 1202, 1207-08 (2011).

14.   Plaintiff is informed and believes and thereon alleges that prior to the incident alleged herein, on or before 1997, and subsequent thereto, SHERIFF BACA and supervisor DOE defendants knew or reasonably should have known, that sheriff deputies, custody personnel, medical personnel, and supervisors, employed by the COUNTY and LACSD, in the course and scope of their employment and under color of law, committed similar acts of failing to provide reasonable security, failing to monitor inmates under their watch, failing to provide adequate mental health care treatment and screening, failing to provide adequate suicide identification and prevention, failing to provide proper classification and security for inmates who should have been in protective custody or in mental health care, and failing to provide adequate monitoring of mental health inmates in administrative segregation. SHERIFF BACA and supervisory DOE defendants became aware, should have become aware based upon facts in their possession, and should have taken corrective actions to prevent repeated incidents of

-6-

supervisors failing to supervise subordinates who were not performing their duties and acting with deliberate indifference to the Constitutional rights of inmates by their knowledge of incidents whereby medical and custody staff failed to provide reasonable security to protect inmates with mental illness; failed to provide reasonable security and mental health care to mentally ill inmates who were at risk of suicide; retaliated against inmates making complaints and inmates with mental health needs; failed to properly classify inmates who should have been in protective custody; failed to properly classify and monitor inmates who were mentally ill and should not have been in administrative segregation; failed to monitor mentally ill inmates in administrative segregation; supervisors failed to conduct investigations or sham investigations of incidents; ratifying wrongful conduct by deputies, medical staff and supervisors that resulted in injuries to inmates or death of inmates, civil litigation, judgments and settlements by failing to implement corrective action to prevent repetition of ongoing wrongful conduct.

15.     There is a long-standing practice in the LACSD of a failure to provide constitutionally minimal safety, security and mental health care to inmates at the MCJ. Multiple agencies, including the U.S. Department of Justice, the Special Counsel to the Los Angeles County Board of Supervisors for the oversight of the LACSD, and the ACLU charged with monitoring jail conditions at the MCJ, (including the provision of mental health care, the jails pursuant to litigation in *Rutherford v. Baca,* 75-04111-DDP), have issued reports concerning the inadequate mental health care provided inmates at MCJ, the violence in the jails, including the risk of deputy- instigated inmate-on-inmate abuse; and retaliation by deputies against inmates.

16.     In a 1997 letter from the Acting Assistant Attorney General of the Civil Rights Division of the U.S. Department of Justice ("DOJ") to the then Los Angeles County Executive, Joanne Sturges, the DOJ reported that "inmates who are

mentally ill or housed in mental health housing are subject to an unacceptably high risk of physical abuse and other mistreatment at the hands of other inmates and custody staff. Moreover, the Jail does not adequately investigate allegations of abuse against inmates."[1] The DOJ reported that they had "received numerous reports from inmates and advocates regarding serious physical abuse of inmates in mental health housing . . . . including kicks, punches, beatings, and sexual assaults. Although the Jail claims that it has discounted some of these claims . . . . the investigation of these clams was inadequate and serious questions remain regarding the extent of physical abuse of mentally ill inmates. We agree with Special Counsel Merrick Bobb's finding that in the Jail 'there is callous treatment [of inmates] at times, a problem that LASD management knows about but has not acted sufficiently aggressively to resolve."[2] Furthermore, "[t]he Jail's failure to investigate promptly and thoroughly allegations of abuse against mentally ill inmates, and its failure to take appropriate action in response to incident of abuse enables the abuse of these inmates to continue."[3] The report also stated, "[t]he treatment received by one inmate indicates that excessive use of force and physical mistreatment or inmates with mental illnesses may be in part the result of inadequate training."[4]

17.   As set forth in the findings, discussed *infra* at ¶ 19, the letter also detailed numerous constitutional violations in mental health care, including in the areas of (1) intake screening and evaluation, (2) diagnosis, (3) referral to mental health

---

[1] Letter from Isabelle Katz Pinzler, Civil Rights Division, USDOJ to Joanne Sturges, Los Angeles County Executive, *CRIPA Investigation of Mental Health Services in the Los Angeles County Jail* 17 (Sept. 5, 1997).

[2] *Id.* at 17-18 (citing Merrick Bobb, Police Assessment Resource Center, ("PARC"), *6th Semiannual Report* 11-13 (Sept. 1996)).

[3] *Id.* at 21.

[4] *Id.* at 18.

professionals, (4) treatment plans, (5) administration of medications, (6) suicide prevention, (7) tracking and medical record keeping, (8) staffing, (9) communication and (10) quality assurance.[5] Plaintiff is informed and believes that SHERIFF BACA, then a LACSD supervisor, had clear written notice of the findings in the letter of the serious pattern of constitutional violations with respect to the provision of mental health care in the MCJ. Plaintiff is informed and believes that SHERIFF BACA was a member of the Sheriff's Executive Council and he reviewed the DOJ's finding, and thus had notice of the LACSD pattern and practice of constitutional violations in the MCJ.

18.   In his tenth Semiannual Report, dated February, 1999, Special Counsel Bobb pointed to a long list of recent crises on the custody side of the Department, including "troubling inmate deaths at the hands of custody personnel[,]" "inmate on inmate violence[,], and 'vigilante-like behavior at Twin Towers."[6]

19.   On December 19, 2002, the Los Angeles County and the United States entered into a Memorandum of Agreement Regarding Mental Health Services at the Los Angeles County Jail ("MOA"). SHERIFF BACA was one of the signers of the MOA, which was entered into to avoid potential litigation concerning the mental health services at the jail."[7]  Among the provisions in the agreement is the acknowledgment that, the "Sheriff of Los Angeles County, and the Los Angeles County Sheriff's Department of Mental health are responsible for overseeing and/or providing mental health services to the inmates at the Jail;" that the "Mental health staff shall make weekly rounds in locked down non-mental health

[5] Memorandum of Agreement Between the United States and Los Angeles County, California Regarding Mental Health Services at the Los Angeles County Jail, p.5, 7, 8, 10, 11, 12, 13, 14, *available at* http:www.justice.gov/crt/about/spl/documents/lacountyjail_mh.php.

[6] Merrick Bobb, PARC, *10th Semiannual Reprot* 12 (Feb. 1999), *available at* http://www.parc.info/client_files/LASD%10th%20Semiannaul%20Report.pdf

housing modules (e.g. administrative segregation, disciplinary segregation) at the Jail to identify inmates who may have been missed during screening or who have decompensated while in the Jail;" "the County shall provide adequate mental health treatment to all inmates determined to be mentally ill;" "the County shall ensure adequate therapy and counseling for all mentally ill inmates who need such care. This includes adequate space for treatment, adequate staff to provide treatment, and adequate therapeutic programming;" "the County shall ensure that inmates observed to be potentially suicidal receive appropriate crisis intervention, (including placement in a safe setting and evaluations in a timely manner), by qualified mental health professional to determine whether and what level of suicide observation is required;" "the County shall provide sufficient mental health staffing to ensure timely access to adequate mental health treatment and meet the obligations and provide the services listed in this Agreement;" "the County shall implement mandatory orientation and continuing competency based in-service training for correctional staff in the identification and custodial care of mentally ill inmates, including, but not limited to: (b) recognizing and responding to indications of suicidal thoughts, (c) proper suicide observation, and (f) response to mental health crises, including suicide intervention . . . , the County shall provide annual refresher training;" and, "Staff shall not be permitted to physically, verbally or mentally abuse inmates with mental illness."[8]

20.    In March 2003, the United States  DOJ sent to County Counsel a compliance letter on the 2002 MOA about treatment of the mentally ill. The letter concluded that the Sheriff's Department was not in compliance with the requirement of the MOA that LACSD "provide mandatory orientation and continuing competency-

---

[8] Memorandum of Agreement Between the United States and Los Angeles County, California Regarding Mental Health Services at the Los Angeles County Jail, p.3, *available at* http:www.justice.gov/crt/about/spl/documents/lacountyjail_mh.php.

based training for correctional staff in the identification and custodial care of mentally ill inmates including, but not necessarily limited to,

    a.    Interpreting or responding to bizarre or aberrant behaviors,

    b.    Recognizing and responding to indications of suicidal thoughts,

    c.    Proper suicide observation,

    d.    Recognizing common side effects of psychotropic medications,

    e.    Professional and humane treatment of mentally ill inmates, and,

    f.    Response to mental health care crises including suicide intervention."

21.    On December 13, 2003, Jose Beas was a pre-trial detainee, having been arrested December 23, 2003, by deputies for an accusation of child molestation. It was later discovered that the investigating deputy had falsified the contents of a tape-recorded statement of Jose Beas in the arrest report, claiming that Beas admitted to inappropriate touching of a minor when the tape recording did not contain such a statement. After being classified as an inmate that was to be kept away from all general population inmates, and being given a wrist band that identified him as such, he was taken to county jail and placed in a holding tank with many general population inmates. He was immediately beaten by other inmates and suffered brain damage. SHERIFF BACA was named as a defendant in a civil case and knew of the allegations of failure to provide reasonable security in the holding cell, lax discipline and failure to supervise, and approved the settlement, yet his response, if any, was not apparent and failure to provide appropriate security and protection of inmates continued.

22.    On April 20, 2004, inmate Raul Tinajero was killed in his cell in the jail, by inmate Santiago Pineda. Pinea had a history of prior misconduct in the jail but deputies failed to follow procedures and write disciplinary reports of this misconduct. Pineda had also previously escaped from jail and was wrongly classified when he killed Tinajero, who was to be a witness in a criminal case against Pineda. Numerous violations showing errors in classification, deputies

-11-

failing to provide reasonable security in the housing cells, lax discipline and failure to supervise ware again presented to SHERIFF BACA, in official reports, but his response, if any, was not apparent and the failure to provide appropriate security and protection of inmates continued.

23. In November 2004, Special Counsel Merrick Bobb presented to Sheriff Baca and the Board of Supervisors a confidential report finding that "Los Angeles County's largest jail is so outdated, understaffed and riddled with security flaws that it jeopardizes the lives of guards and inmates.:[9] The report concluded that Men's Central Jail suffers from "lax supervision and a long-standing jail culture that has shortchanged accountability for inmate safety and security."[10]The Special counsel's report criticized the County Jail in downtown Los Angeles for "failing to prevent dangerous inmates from being housed with lower risk inmates . . ."

24. In his Nineteenth Semiannual Report, dated February 2005, Special Counsel Merrick Bobb noted:

"From the Kolts Report onward, there has been a paradoxical contradiction between Internal affairs investigations that exonerated the officer and litigation arising out of the same incident that cost the County substantial money in settlement and judgments. Those same disparities continue to exist after 2003 and 2004 . . . . While at times one might find instances in which the County's lawyers have unwisely settled, it is far more common to find cases where the LASD let an officer off the hook when a judge or jury would not. We can only say as we have in the past that these disparities 'fuel[] the fire of those who

---

[9]Jack Leonard & Richard Winton, *L.A. Jail Deadly, Outdated*, Los Angeles Times, Feb. 3, 2005, *available at* http://articles.latimes.com/2005/feb/03/local/me-jail3 [hereinafter *L.A. Jail Called Deadly, Outdated*

[10]Megan Garvey & Richard Winton, *Critics of Jails Voice Alarm*, Los Angeles Times, Feb. 14, 2006, *available at* http://articles.latimes.com/2006/feb/14/local/me-jails14.

would strip the Sheriff of the privilege of investigating and disciplining his own employees" (Citing the Fifteenth Semiannual Report at 73).[11]

25.   In August of 2005, Special Counsel Bobb in the 20th Semiannual Report notified Sheriff Baca that his management of the custody facilities was resulting in deputies having very low morale and bitterness due to stagnation in jail assignments for an average of five to seven years.   The report pointed to a substantial number of deputies in custody assignments leaving LASD   for positions with other police agencies (sixty-five in five months) resulting in insufficient staffing and forcing overtime replacements.   The Report advised SHERIFF BACA that any longer than two years in custody assignments was not good for deputies, and lead to deputies being bitter, jaded and complacent.

26.   On October 24, 2005, Chadwick Shane Cochran was booked in county jail for a nonviolent misdemeanor.  His mental health screening revealed a history of mental illness, and he was classified to be housed in a mental health facility located in the jail with suicide and assault precautions for his safety.  Due to errors by staff his protective custody was terminated, and he entered general population on November 16, 2005. On that day, he was beaten to death. Deputies compounded the error of moving Cochran from protective status and left a red color identification card which led attacking inmates to be believe he was an informant.  The deputies responsible for the safety of inmates left their post and supervision of the locked day room in which 40 other inmates, some of them classified as violent, "high risk" inmates, such as  accused murderers and gang members.  Cochran was attacked and yelled for help, but no deputy assumed responsibility to provide security until after the inmates had grown tired of beating Cochran and hid his body under clothing and food trays. The numerous errors in classification, deputies failing to provide appropriate monitoring and

[11]Merrick Bobb, PARC *19th Semiannual Report* 38 (Feb. 2005), *available at* http:www.parc.info/client_files/LASD/19th%20Semiannual%20Report.pdf.

supervision, lax discipline and failure to supervise were presented to SHERIFF BACA in official reports, yet his response, if any, was not apparent and mentally ill inmates are still not provided appropriate protection and security in the jail.

27.   The Office of Independent Reviews, Public oversight Report, 1st Quarter 2007, continued to give notice to SHERIFF BACA, of deputies abandoning their posts, failing to properly classify inmates, not following procedures, failing to conduct timely security checks, leaving inmates unsupervised, deputies using excessive force, and deputies encouraging inmate-on- inmate fights.

28.   In June 2008 the ACLU issued a report by Dr. Terry Kupers, an expert on mental illness among incarcerated populations.[12] The report was filed in the *Rutherford* litigation, served on SHERIFF BACA's counsel, and sent directly to a number of high-ranking officials in the LACSD Custody Division.   In his report Dr. Kupers made a number of conclusions, including:

a.   "[A]t the Los Angeles County Jail the claims by prisoners [of abuse by deputies] is so widespread, and the reports of abuse so consistent among multiple reporters, that it seems very likely there is an unacceptably high incidence of custodial abuse.  Multiple prisoners have told me about abuse they have undergone or witnessed, and most say it is disproportionately directed at prisoners with serious mental illness."[13]

b.   The problem "is made worse by inappropriate un-diagnosing and consignment of prisoners suffering from serious mental illness to general population housing."[14]

c.   "In the Los Angeles County Jail, prisoners who are inappropriately 'undiagnosed' and 'de-classed' because they do not appear obviously

---

[12]Terry A. Kupers, Report on Mental Health Issues at Los Angeles County Jail (June 27, 2008), *available at* http://www.aclu-sc.org/documents/view/173.

[13]*Id*. at 43.

[14]*Id*.

psychotic or suicidal at the time of examination are at very high risk of decompensation or self-harm when they are subjected to harsh conditions such as severe overcrowding or isolation in disciplinary housing. This is why individuals who have a history of serious mental illness require some degree of special housing and ongoing mental health treatment."[15]

d.   "Obviously, placing a prisoner with a mental disease in a segregation cell has very negative effects on his mental health. Yet, when prisoners with mental illness are miss-diagnosed, inappropriately un-diagnosed, inadequately treated and relegated to general population in an overcrowded and otherwise harsh environment such as MCJ, they are quite likely to run afoul of the disciplinary system and wind up in segregation. This pattern is reflected in many of the declarations I reviewed and the stories of the prisoners I interviewed."[16]

e.   "There are large gaps in services [at the Los Angeles County Jail], the jail has become massively overcrowded, and there is disturbing evidence of custodial abuse of prisoners with serious mental illness. A major problem is the large number of prisoners entering the jail who suffer from serious mental disorders and the relative shortage in mental health treatment resources. The large census in the facility, and resultant crowding and idleness at every level, further exacerbate the problems. A very frequent occurrence is the discharge of prisoners with serious mental illness from the mental health housing units in the Twin Towers and their transfer to general population, disciplinary housing or administrative segregation at Central Men's Jail or elsewhere, where there is severe crowding almost no mental health treatments aside from psychotropic medications, very

_____

[15]*Id.* at 34.

[16]*Id.* at 42.

-15-

little out-of-cell time and almost no programing, and in too many cases victimization by other prisoners and/or significant abuse at the hands of custody staff."[17]

f.   "It is very difficult for prisoners in non-mental health housing to get mental health treatment, and the treatment that exists is limited almost exclusively to medications.  Then, in the absence of needed mental health treatment, a disproportionate number in this population find their way to disciplinary housing, where the enhanced isolation and idleness lead to even more exacerbation of their psychiatric disorder and disability."[18]

g.   "There seems to be very little mental health training for most other officers, and given the fact that officers work over-time in most assignments, this means that prisoners with mental illness outside of Tower 1 are often guarded by officers with little or no training in mental health."[19]

29.   Dr. Kupers also made numerous recommendations to address serious problems he found with the treatment of mentally ill prisoners including that "[a]ll officers . . . be required to undergo intensive training in working with prisoners with mental illness"; "significantly decrease the population of the Los Angeles County Jail"; "[r]emove prisoners with mental illness from overcrowded, toxic settings"; ""[c]reate more housing dedicated to providing treatment and safety to prisoners with serious mental illness"; "exclude prisoners with serious mental illness form administrative segregation and disciplinary housing, where the isolation and idleness predictably exacerbate their psychiatric disorder and disability.  They need to be in mental health housing"; "[m]ental health services need to be

---

[17]*Id.* at 46.

[18]*Id.* at 47.

[19]*Id.* at 23.

expanded greatly, especially in non-mental health housing areas"; "[h]alt the inappropriate down-grading of diagnoses"; "[g]ive serious consideration to pre-existing psychiatric histories an current court psychiatric assessment"; '[m]ake mental health treatment accessible to prisoners in all areas of the jail"; '[p]rovide consistent follow-up to Crisis Intervention and stays in TT1 with ongoing mental health treatment wherever the prisoner is transferred"; "[i]mprove [psychiatirc] interventions. There needs to be more comprehensive outpatient mental health services in general population, administrative segregation, and disciplinary housing units"; and that jail officials "halt custodial abuse" by implementing "zero tolerance from the top, education for prisoners about their rights and the grievance process, training and support to encourage staff to report abuse by other staff, a confidential complaint system that fosters prisoner trust and action, and prompt and thorough investigation with appropriate consequences for offending staff."[20]

30.   In April 2010, a Los Angeles County Sheriff's deputy Joshua Sather, who had graduated at the top of his recruit class at the Sheriff's Department, resigned after only a few weeks on the job, alleging that a supervisor made him beat up a mentally ill jail inmate. As with virtually all rookies, his first assignment was jail duty. On March 22, 2010, Sather was working the sixth floor mental health ward of Twin Towers. At some point during Sather's shift, his supervisor and other deputies used force on a mentally ill inmate. Sather claims he participated in an unjustified beating, that shortly before the beating his supervisor had said, "We're gonna go in and teach this guy a lesson," and the attack had been covered up. Sather's uncle confronted the supervisor about making his nephew "beat up 'dings.'"[21] Sheriff's officials launched an investigation and determined that an

---

[20] *Id.* at 47, 48,49 and 51.

[21] Robert Faturechi, *L.A. County Deputy Say He Was Forced to Beat Mentally Ill Inmate,* Los Angeles Times, Oct. 7, 2011, *available at*

uncooperative inmate had been subdued by force, but concluded that no misconduct had occurred.

31.   In May 2010, the ACLU Nation Prison Project and the ACLU of Southern California submitted to the SHERIFF BACA and to the *Rutherford* Court the ACLU's Annual Report on Conditions Inside the Los Angeles County Jail -2008-2009".[22] The report included declarations documenting scores of complaints from inmates and their families about deputy-inflicted injuries, ranging from broken ribs and black eyes to severe head wounds that required staples.   The report documented a persistent pattern of retaliation and threat of retaliation against inmates who protested their conditions of confinement.

32.   In September 2010, the ACLU National Prison Project, and the ACLU of Southern California submitted to SHERIFF BACA and filed with the *Rudtherford* Court the ACLU's "Interim Report on conditions in the Los Angeles County Jails."[23]   In that report, the ACLU commented that the pervasive pattern of violence and retaliation continued unabated in the first eight months of 2010.

33.   In September 2011, the ACLU National Prison Project, and the ACLU of Southern Californian submitted to SHERIFF BACA, and filed with the *Rutherford* Court, a report, "Cruel and Unusual Punishment: How a Savage Gang of Deputies Control LA County Jails."   The report documents in harsh terms

---

http://articles.latimes.com/2011/oct/07/local/la-me-jonor-recruit-20111007.

[22]Mary Tiedeman & Daniel Ballon, ACLU National Prison Project & ACLU of Southern California, *Annual Report on Conditions Inside Los Angeles County Jail 2008-2009* (May 5, 2010), filed in *Rutherford v. Baca*, 75-cv-04111-DDP(no. 226). The report is also available at: http://www.aclu.org/files.assets/2010-5-5-AnnualReport-JailConditionsatMCJ.pdf.

[23]Mary Tiedeman *et al.*, ACLU National Prison Project & ACLU of Southern California, *2010 Interim Report on Conditions in the Los Angeles County Jails* (Sept. 9, 2010), filed in *Rutherford v. Baca,* 75-cv-04111-DDP (no. 226).   The report is also available at: http://www.aclu.org/files/assests/2010-9-9-LACountyJailsReport.pdf.

-18-

numerous incidents of deputy-on-inmate violence, and a total failure by the command staff to fairly investigate, discipline officers, and protect inmates. The report details how deputies would retaliate against inmates by taking them out of protective custody and place inmates in general population where the inmates would be severely beaten, and in one particular instance, an inmate repeatedly told a deputy that inmates were threatening to stab him, and asked to be placed in protective custody, and custody assistant not only told him that he would not be moved to protective custody but that he would be move closer to the front where he would be an easier target.

34.    SHERIFF BACA first flatly denied the existence of a systemic problem of abuse in jails. Nicole Nishida, one of the Sheriff's spokespersons, said that the department thoroughly investigated all complaints of abuse that it receives and that most were unsubstantiated.[24] As widespread criticism of SHERIFF BACA continued to mount, and new allegations surfaced, the Sheriff acknowledged there were widespread problems but claimed that he had not been aware of its existence. As reported on October 20, 2011, SHERIFF BACA stated: "We are going to look into this we welcome anyone to look into it as well." He contended that "[t]he widespread problem can't be defined until we know what all the issues are."[25]

35.    Finally, in early December 2011, Robert Olmsted, a retired top LACSD official who had been the Captain in change of Men's Central jail before being promoted to Commander in the LACSD's Custody Division, and who oversaw both Men's Central Jail and Twin Towers, publicly disclosed that SHERIFF BACA and other

[24]Jennifer Medina, *Report Details Wide Abuse in Los Angeles Jail System,* N.Y. Times, Sept. 28, 2011, *available at* http://www.nytimes.com/2011/09/28/us/aclu-suit-details-wide-abuse-in-los-angeles-jail-system.html? r=1&pagewanted=all.

[25]Jennifer Medina, *Pressed, Sheriff Agrees to Jail Inquiry,* N.Y. times, Oct. 10, 2011, *available at* http://www.nytimes.com/2011/10/11/us/pressed-sheriff-agrees-to-abuse-inquiry.html? R=1&scp=1&sq=margaret%20winter%aclu%st=cse.

senior department staff, have long had actual knowledge of the pattern of widespread deputy violence in the Jails, and widespread failures to protect the safety and security of inmates in the Jails. Olmsted had repeatedly informed Defendant SHERIFF BACA, and other senior Departmental Staff, including Paul Tanaka, Undersheriff of the LACSD who is second-in-command of the Department, and Dennis Burns, currently Chief of the Custody Operations Division, which along with the Correctional Services Division, is responsible for the operations of the County jails.   SHERIFF BACA, and Paul Tanaka and Dennis Burns, have long had actual knowledge of the pattern of widespread deputy-on-inmate violence in the jails, retaliation against inmates, and mistreatment of mentally ill inmates.   Olmsted had repeatedly informed, SHERIFF BACA, Tanaka and Burns of problems in the jail, and tried to raise flags about shoddy investigations that allowed deputies to escape scrutiny for using force. SHERIFF BACA never followed up with Commander Olnsted after he approached him two times about problems in Men's Central Jail.

36. Witness LA reported: "In a series of interviews with the *LA Justice Report,* Olmsted [stated] . . . '[T]he real problem is how departmental leadership allowed this jail situation to occur.'" "The problems inside the jail were ignored by the Sheriff's commands staff. I went to [Custody chief Dennis] Burns, [Undersheriff Paul] Tanaka. And I went to Lee Baca. I told them I needed help trying to corral this situation and I was ignored."[26]

37. In response to the latest revelations from Commander Olmsted, SHERIFF BACA, rather than accepting responsibility, publicly laid blame on Commander Olmsted for not solving the problem. Commander Olmsted didn't need to "ask permission to solve the problem," Baca said.   The Los Angeles Times commented, on

---

[26]Matthew Fleischer, *Dangerous Jails, Part 2: Ignoring the Warnings,* Witness LA, De. 1, 2011, *available at* http://witnesslad.com/sheriff-lee-baca/2011/admin/dangerous-jails-part-2-ignoring-the-warnings-by-matt-fleischer/

-20-

December 2, 2011:

> Never mind that a quasi-military organization like the Sheriff's
> Department is all about following the chain of command. Or that Baca is
> trying to have it both ways, suggesting the command staff failed him by
> shielding him from the truth, and at the same time blaming Olmsted for not
> taking care of the problem on his own. How many times can Baca plead
> ignorance? This is just the latest in a series of objectionable responses that
> calls into question whether he is capable of running, let alone, re-forming,
> the nation's largest jail system."[27]

38. On January 10, 2012, SHERIFF BACA testified to the Board of Supervisors that
use of force often arises when inmates have been declassified from mental health
housing in TTCF Tower 1 to be returned to Men's Central Jail. This practice of
improperly declassifying mentally ill inmates from mental health housing in
Tower 1 and placing them in general population at MCJ is one that Dr. Kupers
identified almost four years earlier as resulting in the abuse of mentally ill
inmates.

39. On January 11, 2012, the Los Angeles Times reported that the Sheriff's
Department had admitted that use of force against inmates in the Los Angeles
County jails was disproportionately directed at inmates with mental illness. "Los
Angeles County jailers are more likely to use force against mentally ill inmates
that other prisoners, according to a new Sheriff's Department Report that
acknowledges the lockups need specially trained staff to reduce the violence."[28]

---

[27]Editorial, *Baca's Jails are Baca's Problem: Sheriff Lee Baca Should Stop
Blaming Others and Take Responsibility for Fixing L.A. County's Jails,* Los
Angeles Times, Dec. 2, 2011, *available at*
http://artilces.latimes.com/2011/dec.02/opinion/la-ed-baca-20111202.

[28]Jack Leonard & Robert Faturechi, *L.A. County Jailers More Likely to Use
Force on Mentally Ill Inmates*, Los Angels times, Jan 11, 2012, *available at*
http://www.latimes.com/news.local.la-me-sheriff-jails-20120111,2284536.story.

## FACTUAL ALLEGATIONS RELATING TO STEVE CABRERA

40.   STEVE CABRERA entered the custody of MCJ on or about October 15, 2007.

41.   On or about January 30, 2008, Mr. CABRERA attempted suicide at MCJ by hanging himself. Custody staff discovered him hanging, and he was taken to the MCJ medical staff. He also swallowed 4 razors. Even though it was an obvious suicide attempt, Mr. CABRERA denied attempting suicide. The medical staff placed an involuntary psychiatric hold on Mr. CABRERA pursuant to California Welfare & Institutions Code § 5150. The medical staff diagnosed Mr. CABRERA with a mood disorder NOS, thereby determining that he had a mental condition. DOE Custody and Medical Staff knew or had access to information that Mr. CABRERA attempted suicide in 2008 and was diagnosed with a mental health condition.

42.   Mr. CABRERA was a gang drop out.  As a gang drop out, the jail staff designated Mr. CABRERA as "K-10 PC", which means that he was in protective custody and was placed on a floor with no gang members and only gang drop outs or informants.  DOE Custody Staff knew that Mr. CABRERA had dropped out of a gang by virtue of his designation as a K-10 PC. Nevertheless, DOE Custody Staff  placed Mr. CABRERA back on an active gang floor of the 3000 module even though, as a gang drop out, he would be in danger of harassment and violent assaults by other inmates.

43.   In the months preceding his suicide, Mr. CABRERA was afraid for his life. DOE Custody Staff removed him from protective custody and then transferred him back to a gang floor in the 3000 module, when they knew he was not an active gang member. This placed Mr. CABRERA in grave danger, and made him fear for his life. The 3000 module is where the most violent gang members are housed. It was known to DOE Custody and Medical Staff that gang drop outs are at serious risk of harm from gang members if they are housed together.

44.   Mr. CABRERA repeatedly requested that DOE Custody Staff remove him from

-22-

the gang floor because he was afraid that he would be killed by gang members because he was a gang drop out. If a former protective custody inmate is transferred to an active gang floor, that subjects that person to being green lighted, or having a gang shot caller place a "hit" on your life. The custody staff at MCJ is aware that there is a potential for someone to be green lighted when they are transferred from a protective custody floor to an active gang floor.

45. Despite their knowledge of the risk to Mr. CABRERA's life by being on an active gang floor, and their knowledge that his placement would undoubtably increase his stress level and fear for his life, and exacerbate his mental condition, Plaintiffs are informed and believe, and thereon allege, that DOE Custody Staff repeatedly denied his requests for transfer off the gang floor, improperly classified him, retaliated against him for his complaints that he should be in protective custody, and improperly kept him on an active gang floor, thereby endangering his life, failing to protect him, and exacerbating Mr. CABRERA's known fragile mental condition, and known suicide risk, since they knew he attempted suicide in 2008.

46. On August 28, 2010, custody staff and medical staff saw Mr. CABRERA, who had a cut to his head by a razor. He told the hospital staff that someone had sliced his head with a razor.

47. On September 8, 2010, Mr. CABRERA slit one of his arms with a razor blade, in another apparent suicide attempt. Medical records indicate that he told medical staff that someone had cut him, and later told medical staff that he had cut himself. Either this was a suicide attempt, or Mr. CABRERA's prediction gang members would assault him proved to be true. He was placed in a safety cell, then returned to his cell in administrative segregation on the 3000 module active gang floor, still with the bandages on his wounds. Plaintiffs are informed and believe this was a suicide attempt. DOE Custody and Medical Staff knew Mr. CABRERA had a serious injury with cuts to his arm that indicated an attempt by

Mr. CABRERA to commit suicide. Doe Custody and Medical Staff with reckless disregard to his mental health condition and his risk for suicide, inappropriately transferred Mr. CABRERA back to administrative segregation housing on the 3000 module active gang floor, thereby recklessly exacerbating his risk for suicide. Administrative segregation is lock down 23 hours a day, seven days a week, and inmates are housed in isolation. Isolation is a known suicide risk factor.

48.   Despite knowledge of his prior suicide attempt in 2008; his mental illness and condition; his prior 5150 hold due to being a danger to himself; the attack by another inmate on the 3000 module active gang floor on August 28, 2010; the September 8, 2010 suicide attempt or attack by an active gang member, DOE Custody and Medical Staff failed to protect Mr. CABRERA from a known suicide risk, failed to provide necessary mental health treatment that would have prevented his suicide; failed to properly classify him and maintain him in mental health treatment housing, and failed to properly house him and protect his physical safety; DOE Custody and Medical Staff acted with deliberate indifference to a known suicide risk and mental health condition, that they, in fact, exacerbated by denying his requests for protection and by failing to take adequate measures to protect against the risk of harm to Mr. CABRERA. They also failed to place him in a safety cell or suicide watch to prevent another suicide attempt, and failed to adequately monitor him in solitary confinement in administrative segregation to prevent another suicide attempt, and kept him in isolation, thereby exacerbating his suicide risk,

49.   On October 5, 2010, shortly thereafter, Mr. CABRERA attempted suicide, and this time was successful. He hung himself.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF 42 U.S.C. § 1983 - - WRONGFUL DEATH
## AGAINST DOES 1 THROUGH 10

50.    Plaintiffs incorporate by reference the allegations in Paragraphs 1- 49 above, as if fully set forth herein.

51.    DOE Custody Staff were responsible for STEVE CABRERA's physical safety, to protect him from other inmates threatening his life, to prevent suicide risk that was known to them,  properly house and classify him to protect him; and communicate to DOE Medical Staff any mental or medical issues that would threaten Mr. CABRERA's safety.

52.    DOE Medical Staff were responsible for providing Mr. CABRERA with medical and mental health treatment, follow-up and supervision.  They were responsible for communicating with custody staff regarding any suicidal risks for Mr CABRERA and regarding the proper housing and precautions that should be taken to protect Mr. CABRERA's physical safety, mental and medical health. DOE Medical Staff knew that Mr. CABRERA was a risk for suicide on October 5, 2010, as he suffered the razor cuts to his arm on September 8, 1010 that required hospitalization.  They knew he required reasonable medical and mental care and treatment, supervision and monitoring, that he had a prior suicide attempt, and that without proper housing, supervision and monitoring, that his mental condition would deteriorate, and he would be a suicide risk.

53.    Plaintiffs is informed and believes, and thereon alleges, that DOE DEFENDANTS acted with deliberate indifference and/or reckless disregard for STEVE CABRERA's known mental health condition, suicide risk and physical safety, in that they ignored and/or failed to reasonably monitor and to provide security to prevent STEVE CABRERA from committing harm to himself; they ignored and/or failed to reasonably monitor and provide the required mental and medical monitoring that allowed Mr. CABRERA's medical and mental condition

-25-

to deteriorate.

54.    By committing and/or ignoring the following acts that led up to Mr. CABRERA's suicide, DOE DEFENDANTS were deliberately indifferent to and/or recklessly disregarded the foreseeable risk that Mr. CABRERA would commit suicide:

A) DOE Custody and Medical Staff knew that Mr. CABRERA attempted suicide in 2008;

B) In the months preceding his suicide, Mr. CABRERA was afraid for his life. He was a gang drop out. DOE Custody Staff had placed him in protective custody and then transferred him back to a gang floor in the 3000 module. The 3000 module is where the most violent gang members are housed.  It is known to DOE Custody and Medical Staff that gang drop outs are at serious risk of harm from gang members if they are housed together.

C) Mr. CABRERA repeatedly requested that DOE Custody Staff remove him from the gang floor because he was afraid that he would be assaulted or killed by gang members because he was a gang drop out.

D) DOE Custody Staff repeatedly denied Mr. CABRERA's requests, thereby endangering his life, failing to protect him, and exacerbating his known mental condition and suicide risk since they knew he attempted suicide in 2008.

E) On August 28, 2010, Mr. Cabrera was assaulted by detainees. On September 8, 2010, Mr. CABRERA slit his arm with a razor blade, in another apparent suicide attempt. DOE Custody and Medical Staff knew Mr. CABRERA had a serious injury with cuts to his arm. Medical records indicate that Mr. CABRERA stated that another inmate cut him and, later, that he cut himself. Regardless, Mr. CABRERA was clearly at risk of harm, either self-inflicted or inflicted by others.

F) Despite knowledge of these facts, DOE Custody and Medical Staff failed to protect Mr. CABRERA, take him off an active gang floor and properly reclassify him; and  provide him the necessary monitoring and mental health treatment to prevent a further suicide attempt while in isolation in administrative segregation on the 3000

-26-

floor.

G) DOE Custody and Medical Staff deliberately ignored Mr. CABRERA's suicide risk and exacerbated it by failing to take any measures to protect him such as removing him from the gang floor, placing him on suicide watch and/or safety cell or keeping him in the jail hospital for observation, or adequately monitor him and provide mental health care treatment on the 3000 floor.

55.   Due to their deliberate indifference to and/or reckless disregard of the reasonably foreseeable and serious risk of harm to STEVE CABRERA; their failure to remove him from an active gang floor, re-classify him, and protect him from gang inmates which exacerbated his known suicide risk; their failure to provide mental health treatment; their failure to take any steps to protect him from self-harm, and their failure to timely intervene to provide reasonable security, monitoring and safety necessary in order to prevent Mr. CABRERA from harming himself, the actions and inactions of the DOE Custody and Medical Staff proximately caused Mr. CABRERA's death by suicide on October 5, 2010.

56.   STEVE CABRERA was subjected to deprivation of rights by DOE Custody and Medical Staff. Each of them, acting under color of law, deprived Mr. CABRERA of his rights under the statutes, ordinances, regulations, customs and usages of the laws of United States and the State of California, which rights included, but are not limited to, the privileges and immunities secured to STEVE CABRERA by the Fourteenth or Eighth Amendments to the United States Constitution and laws of the United States, particularly: a) his right to access to mental health and medical care and treatment for her serious but treatable condition and suicide risk; b) his right to adequate, reasonable security, monitoring, supervision, classification and housing for his mental health; c) his right to be protected from harm from other inmates and reasonable security, including his right to be classified and segregated so that his life would be protected, the deprivation of each of which was also a cause of his suicide.

-27-

57. As a result, Plaintiffs REINA MARIBEL CAMPOS, as successor in interest and personal representative of STEVE CABRERA, and BLANCA CARDENAS, as successor in interest and personal representative of STEVE CABRERA, have suffered damages, pain and suffering, anguish, depression and loss of life and deprivation of his constitutional rights in an amount not yet ascertained but to be proven.

58. As a result, Plaintiff REINA MIRABEL CAMPOS, in her individual capacity, has suffered loss of her constitutionally protected liberty interest in familial relations, and love, comfort, society, affection, and companionship of her son, STEVE CABRERA, as a result of the wrongful death of her son in an amount not yet ascertained but to be proven. As a result, Plaintiff BLANCA CARDENAS, in her individual capacity, has suffered loss of her constitutionally protected liberty interest in familial relations, and love, comfort, society, affection, and companionship of her husband, STEVE CABRERA, as a result of the wrongful death of her son in an amount not yet ascertained but to be proven.

59. DOE Custody and Medical Staff acted recklessly or with callous indifference to STEVE CABRERA's constitutional rights and should be assessed punitive damages.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF 42 U.S.C. § 1983 - - POLICY, CUSTOM OR PRACTICE CAUSING VIOLATION OF CIVIL RIGHTS AGAINST DEFENDANTS COUNTY AND LACSD

60. Plaintiffs incorporate by reference the allegations in Paragraphs 1- 59 above, as if fully set forth herein

61. At all times stated herein, Defendants COUNTY and LACSD were public entities and municipal corporations, duly organized and existing under and by virtue of the laws of the State of California. These Defendants through their policy makers

deprived STEVE CABRERA of his rights, privileges and immunities secured by the Fourteenth or Eighth Amendments of the United States Constitution, by maintaining the following customs, policies, and /or practices:

A) Failing to hire, train and place deputies in MCJ with the experience and training to detect detainees, such as Mr. CABRERA, with serious mental conditions, and suicidal risk;

B) Placing those deputies with the least experience on the most dangerous floors of the MCJ with high risk gang inmates and vulnerable protective custody inmates, such as Mr. CABRERA. These inexperienced deputies lacked the training, supervision, and knowledge to determine which detainees were suicidal, had mental problems, and were endangered by other detainees, resulting in the those custodial deputies failing to recognize that Mr. CABRERA was at serious risk of harm, was suicidal, and was at risk of harm from other inmates;

C) Disciplining deputies who had been determined to be unsafe to work on the streets by placing them at MCJ and giving them responsibility for the monitoring, care, and protection of inmates. These deputies who had been disciplined for misconduct lacked the training, supervision,  knowledge, and judgment to determine which detainees were suicidal, had mental problems, and were endangered by other detainees, resulting in the those custodial deputies failing to recognize that Mr. CABRERA was at serious risk of harm, was suicidal, and was at risk of harm from other inmates;

D) Failing to train, supervise, and discipline custodial deputies who were deliberately indifferent to detainees' serious  mental and medical needs. Deputies had inadequate training to identify and protect mentally ill inmates and potentially suicidal inmates.  This placed inmates such as Mr. CABRERA at serious risk of physical danger from themselves and from other detainees;

E) Failing to train, supervise, and discipline custodial deputies who were deliberately indifferent in classifying and housing detainees, such as Mr. CABRERA who should have been in protective custody as a gang drop-out but was housed with

-29-

gang members. This resulted in those custodial deputies being unable and/or unwilling to determine which detainees were at serious risk of harm from other detainees, or who were suicidal because of their fear of serious risk of harm from gang detainees and other detainees; and also resulted in those deputies acting in reckless disregard to the safety of inmates by deliberately ignoring the reasonable housing, classification and transfer requests of inmates whose physical safety was in jeopardy, especially those inmates wh should have been kept in protective custody but were deliberately kept in active gang floors and general population, or deputies using improper classification of inmates as a method of punishment, by housing inmates who should be in protective housing in general population or housing in gang populations which resulted in increased suicide risk and risk of injuries from other inmates;

F) Failing to train, supervise and discipline custodial deputies and medical staff to ensure proper communication between the custodial and medical staff of information to ensure continuity of care of detainees, proper placement and classification of detainees, ensuring that detainees who were in danger from other detainees or suicidal or who had serious mental and medical needs, such as Mr. CABRERA, were properly housed. This resulted in detainees such as STEVE CABRERA not having access to medical care and treatment necessary to ameliorate their mental and medical conditions, which foreseeably resulted in increased risk of suicide and suicide attempts;

G) Failing to train, supervise, and discipline custodial deputies and medical staff who failed to provide continuity of care, access to medical care and treatment to detainees who were mentally ill, suicidal, and had prior suicide attempts, resulting in detainees, such as STEVE CABRERA, committing or attempting suicide;

H) Failing to decrease the population at MCJ so medical staff could properly monitor mentally ill and potentially suicidal inmates, and failing to have enough mental health cells that could accommodate more mentally ill patients so that they could be properly treated and monitored;

I) Failing to train medical staff so that they do not improperly un-diagnose or de-

-30-

classify mentally ill inmates and potentially suicidal inmates;

J) Failing to expand mental health services in non-mental health treatment cells, such as administrative segregation; and,

K) Failure to train deputies to not retaliate, punish, and abuse mentally ill patients whose behavior is a product of mental illness, not done to violate jail rules.

62.    Defendants' customs, polices or practices were a moving force and legal cause of STEVE CABRERA's injuries, and each individual defendant acting in accord with these customs, policies or practices acted with deliberate indifference to the needs of persons such as Mr. CABRERA who was incarcerated at defendant COUNTY and LACSD' MCJ facility.  Plaintiffs also allege that the conduct of each Defendant caused Mr. CABRERA to suffer grievous harm, pain and suffering, cruel and unusual punishment while he was housed at MCJ, and Plaintiffs hereby petitions the Attorney General of the United States to institute a civil action or intervene in this action pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1007.

63.    As a reasonably foreseeable and proximate cause of the conduct of Defendants COUNTY and LACSD, as described above, Plaintiffs suffered damages and injuries as set forth above in paragraphs 30 through 32 incorporated herein.

## THIRD CLAIM FOR RELIEF

### VIOLATION OF 42 U.S.C. § 1983 -- FAILURE TO SUPERVISE, TRAIN, AND TAKE CORRECTIVE MEASURES CAUSING VIOLATION OF CIVIL RIGHTS AGAINST DEFENDANTS THE COUNTY, LACSD, SHERIFF BACA AND DOES 1 THROUGH 10

64.    Plaintiffs incorporate by reference the allegations of paragraphs 1- 63 above, as if fully set forth herein.

65.    Plaintiffs is informed and believes and thereon alleges that the COUNTY, LACSD, DOE Supervisors and Defendant Sheriff Baca knew, or in the exercise

of reasonable care should have known of a history and propensity and pattern at the time of this incident for custody and medical staff of the MCJ to fail to provide reasonable security, monitoring and supervision of detainees such as STEVE CABRERA; failure to lower prison populations so constitutional minimal mental health care and monitoring could be provided inmates; to fail to properly segregate, house, classify protective custody inmates or inmates who should be in protective custody,, thereby placing their physical safety at risk; failing to properly segregate, house, classify mentally ill inmates, thereby increasing their risk of suicide; to fail to comply with and/or implement policies and procedures of the MCJ or ensuring the enforcement thereof; to fail to train custody staff to identify, protect and refer to medical staff inmates who are mentally ill or potentially suicidal; failure to train deputies not to retaliate, punish, or abuse mentally ill inmates whose behavior is a manifestation of their disease not rule-breaking behavior; to fail to train and ensure that custody and medical staff provide reasonable security and monitoring of detainees such as STEVE CABRERA and that custody and medical staff provide prompt and competent access and delivery of mental health attention and intervention when detainees, such as STEVE CABRERA have a mental health crisis requiring prompt intervention, whether in isolation in administrative segregation or mental health housing. Defendants COUNTY, LACSD, SHERIFF BACA's and DOE Supervisors' disregard of this knowledge or failure to adequately investigate and discover and correct such acts or failures to act was a moving force which caused the violation of Mr. CABRERA's constitutional rights.

66.   Plaintiffs is informed and believes, and thereon alleges, that prior to the incident alleged herein, Defendants COUNTY, LACSD, SHERIFF BACA, DOE Supervisors, and the custodial and medical staff at the MCJ, acting under the color of their authority as supervisor officers, custodial supervisors, physicians, nurses, staff and all mental health and medical care providers, and in the course

and scope of their employment as such, committed similar acts of:

A) Failure to provide access to and failure to deliver mental health and medical care and treatment, and monitoring  for MCJ detainees with known mental health conditions and risk of suicide;

B) Failure to provide adequate housing and proper classification of MCJ detainees so that they would have access to and delivery of indicated mental health and medical care;

C) Failure to provide adequate and reasonable monitoring and housing for MCJ detainees that present a risk of suicide to prevent mental health deterioration such as attempted suicides and suicides, whether in administrative segregation or mental health housing;

D) Failure to supervise their subordinates to ensure that custody and medical staff were implementing and complying with policies and procedures to ensure the reasonable security and safety of detainees;

E) Failure to supervise and train custody staff to ensue that detainees who needed to be in protective custody away from gang detainees were so housed; and/or

F) Failure to prevent punishment against detainees who had known mental health disabilities by use of a disciplinary system that increases incarceration and imposes punishment for behavior resulting from or caused by their mental illnesses or psychological conditions, or with inmates who complained about their classification status.

67.   Plaintiffs are further informed and believe, and thereon allege, that Defendants COUNTY, LACSD, SHERIFF BACA and DOE Supervisors knew, were deliberately indifferent to, or in the exercise of reasonable care should have known of this pattern or practice of unconstitutional violations, or the existence of facts which create the potential of unconstitutional acts, and these Defendants had a duty to train and instruct their subordinates to prevent similar acts against other detainees, but failed to take steps to properly train, supervise, investigate

-33-

or instruct custody and medical staff; retained custody and medical staff who had a history of inappropriate conduct; and placed inexperienced deputies and deputies who had been disciplined for misconduct in the MCJ. As a result of these acts and failures to act, STEVE CABRERA was harmed in the manner threatened by the pattern or practice.

68.   At all times herein mentioned, and prior thereto, Defendants COUNTY, LACSD, SHERIFF BACA and DOE Supervisors had the duty:

A) To train, supervise, and instruct custody and medical staff to ensure that they respected and did not violate federal and state constitutional and statutory rights of detainees;

B)To train, supervise and instruct custody and medical staff to objectively investigate incidents of in-custody injury, deaths, suicides and suicide attempts, inadequate classification and contraindicated housing, and to take remedial action to correct errors in such investigation;

C) To train, supervise, and instruct custody and medical staff to provide access to and delivery of adequate mental and medical health care, continuity of care, monitoring, intervention, treatment, follow-up, and attention to injured, mentally ill or potentially suicidal detainees, the lack of which resulted in serious injury or loss of life;

D) To train, supervise, and instruct custody and medical staff to periodically monitor a detainee's serious mental health and medical conditions and suicide risk, the lack of which may result in serious injury or loss of life;

E) To train, supervise, and instruct custody and medical staff to periodically monitor the quality and adequacy of mental health and medical care, attention and treatment provided to detainees who are mentally ill, have had suicide attempts, or who are at risk of suicide;

F) To train, supervise, and instruct custody and medical staff to periodically monitor the competency of medical and custodial staffing to ensure that custodial staff counselors were providing reasonable security to detainees who should be in protective

custody, mentally ill, had suicidal attempts or were at risk of suicide;

G)  To train, supervise, and instruct custody and medical staff to periodically monitor the classification and housing of detainees, or to identify detainees who should be classified in protective custody, as mentally ill, or as suicidal,  to ensure they have reasonable security and safety and are properly housed;

H) To train, supervise, and instruct custody and medical staff to comply with the statutory guidelines and regulations enacted for the protection of detainees held in a custodial setting;

I)  To discipline and to establish procedures to correct past violations and to prevent future violations of constitutional rights of detainees, rather than placing deputies in the MCJ as a form of discipline for their conduct on the streets and condoning, ratifying, and/or encouraging the violation of detainees' constitutional rights;

J) To train, supervise, and instruct custody and medical staff on understanding, recognizing, reporting and responding to issues of detainees' mental health care and treatment, and communicating with each other as to detainees' mental and medical status, potential suicide risk and prior suicide attempts, and proper housing to ensure detainees' mental health safety and protection;

K) To train, supervise, and instruct custody and medical staff not to discriminate against detainees who were suicidal, complained to staff, who had known mental health disabilities and not to use a disciplinary system that increases incarceration and imposes punishment for behavior resulting from or caused by detainees' mental health conditions;

L) To train, supervise, and instruct custody staff not place at risk detainees in high risk modules, such as the 3000 module, where dangerous gang detainees were housed, and where inexperienced deputies and deputies had been disciplined for misconduct were stationed;

M) To train, supervise and instruct custody staff to identify mentally ill or

-35-

potentially suicidal inmates, and refer to medical staff when appropriate; and,

N) To train, supervise and instruct custody staff to not retaliate, punish or abuse mentally ill inmates for behaviors that manifest their mental illness and are not meant to violate rules or disrespect their authority;

69. Defendants breached said duties by failing to train, supervise and instruct custody and medical staff as described in paragraph 41:

70. Defendants, COUNTY, LACSD, SHERIFF BACA and DOE Supervisors, by their own culpable action and inaction in the training, supervision and control of the custody and medical staff, contributed to the constitutional violations alleged herein, and their reckless or callous indifference to the rights of others, by failing to train, supervise and control the custody and medical staff as alleged herein, and by contributing to the constitutional violations committed by the medical and custody staff, caused harm to STEVE CABRERA and injury to Plaintiffs.

## FOURTH CLAIM FOR RELIEF

## GENERAL NEGLIGENCE - - AGAINST the COUNTY, LACSD, and DOES 1 THROUGH 10

71. Plaintiffs incorporate by reference the allegations of paragraphs 1 - 70 above, as if fully set forth herein.

72. By virtue of the foregoing, the COUNTY, LACSD, DOE Medical Staff and DOE Custody Staff owed Mr. CABRERA a duty of due care, and that duty was breached by the Defendants' negligence and gross negligence, in delaying and denying medical attention and access to medical and mental health care to him; failing to properly house and classify him to protect his physical safety from other inmates due to his status; failing to monitor and provide continuity of care based on facts that would place a reasonable person on notice that Mr. CABRERA should not continue in the same housing where he was harmed just twenty-seven days prior to his suicide; failing to properly monitor Mr. CABRERA in isolation

in administrative segregation; and failing to communicate to custody staff he needed to be monitored and needed to be housed in a setting that would ensure such monitoring such as the medical ward at MCJ, or a safety cell, or protective housing, the COUNTY, LACSD, and DOE DEFENDANTS breached their duty of care to observe, report, monitor and provide reasonable security regarding STEVE CABRERA's condition and failed to prevent his suicide attempt.  The COUNTY, LACSD, and each DOE DEFENDANT was negligent, and their negligence proximately caused Mr. CABRERA's suicide and Plaintiffs's injuries because their actions caused an unreasonable risk of harm to Mr CABRERA.

73.    By virtue of the foregoing, DOE Supervisors owed Plaintiffs and Mr. CABRERA a duty of care.  This duty of care was breached in the hiring, supervision, training, retention and investigation of each of the medical care providers  or custody personnel who classified, housed and failed to supervise and monitor Mr. CABRERA, who delayed or denied his medical attention or access to medical care and treatment, and failed to protect him and place him in an appropriate floor away from gang members in the 3000 module. The COUNTY, LACSD, and each DOE DEFENDANT was negligent, and their negligence proximately caused Mr. CABRERA's suicide and Plaintiffs's injuries because their actions caused an unreasonable risk of harm to Mr. CABRERA.

74.    By virtue of the foregoing, the COUNTY, LACSD, and DOE Custody and Medical Staff had a duty to provide reasonable security and render access and delivery of mental and medical care, treatment and/or emergency services to STEVE CABRERA  based on his mental and medical condition, past suicide attempt, and recent injuries caused by cuts to his arm, had a duty to monitor him when they returned a mentally ill, potentially suicidal inmate to isolation in administrative segregation, and had a duty to remove him from the gang floor because he was a gang drop out and complained that he should not be housed with gang members.  They each breached their duty of care to observe, report,

monitor and provide reasonable security regarding STEVE CABRERA's condition and failed to prevent his suicide attempt. The COUNTY, LACSD, and each DOE DEFENDANT was negligent, and their negligence proximately caused Mr. CABRERA's suicide and Plaintiffs's injuries because their actions caused an unreasonable risk of harm to Mr CABRERA.

75.   The conduct alleged was the legal cause of the death of Mr CABRERA, and the wrongful death damages claimed.

## FIFTH CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA GOV'T. CODE § 845.6
### AGAINST the COUNTY, LACSD, and DOE DEFENDANTS 1 - 10

76.   Plaintiffs incorporate by reference the allegations of paragraphs 1 - 75 above, as if fully set forth herein.

77.   By virtue of the foregoing, the COUNTY, LACSD, and DOE Medical Staff knew or had reason to know that STEVE CABRERA needed immediate medial care and that he had serious and obvious mental and medical conditions that put the medical staff on notice that he should have had his medical and mental condition monitored going forward from September 8, 2010; that he should have not been housed in the same 3000 module with gang members where he was injured on September 8, 2010; that in isolation in administrative segregation he needed immediate medical care and was not given such care. The failure to provide immediate medical care and mental health care, where his health and mental condition were deteriorating, proximately caused his suicide.

78.   The COUNTY, LACSD, and DOE Medical Staff's breach of their duty was a legal cause of STEVE CABRERA's suicide on October 5, 1010 and, as a result, Plaintiffs was injured as set forth above.

-38-

## SIXTH  CLAIM FOR RELIEF

## NEGLIGENCE - - CALIFORNIA GOV'T. § 844.6(d)

## AGAINST the COUNTY, LACSD, SHERIFF BACA and DOE DEFENDANTS
## 1 - 10

79.   Plaintiffs incorporate by reference the allegations of paragraphs 1 - 78 above, as if fully set forth herein.

80.   Defendants COUNTY, LACSD, SHERIFF BACA and DOE DEFENDANTS 1 - 10, owed Mr. CABRERA, as an inmate in their custody, care and control, a duty of due care to protect his health and physical safety.

81.   Defendants were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as custodians and/or health care providers to Mr. CABRERA, by failing to provide him adequate mental health care; by failing to monitor his suicide risk; and by failing to properly classify, house and segregate him from known dangers from other detainees due to his gang drop out status and prior protective custody status.  It was foreseeable that as a result of Defendants' acts and omissions, as described above, and their actions were the legal cause of Mr. CABRERA'S injuries and suicide.

## SEVENTH CLAIM FOR RELIEF

## VIOLATION OF CALIFORNIA GOV'T. CODE § 815.6

## AGAINST the COUNTY and LACSD

82.   Plaintiffs incorporate by reference the allegations of paragraphs 1 - 81 above, as if fully set forth herein.

83.   California Government Code § 815.6 makes a public entity liable for its failure to discharge a mandatory duty imposed by an enactment designed to protect against the risk of a particular kind of injury.

84.   California Government Code § 845.6 imposes such a mandatory duty.  The purpose of § 815.6 is, in part, to ensure the safety and health of inmates and to

provide inmates with medical care when the need for medical care becomes apparent.

85.   Defendants COUNTY and LACSD breached the mandatory duty owed to Mr. CABRERA pursuant to California Government Code § 845.6. As set forth herein, Defendants' breach of said duty caused the type of harm to Mr. CABRERA that the enactment was designed to prevent.

86.   Furthermore, Defendants COUNTY and LACSD had a duty to provide reasonable and adequate medical services to inmates within their care and custody. Upon information and belief, despite the actual and constructive knowledge of the inadequacy of its health services, including numerous avoidable injuries and inmate deaths, Defendants failed to sufficiently staff, equip train and treat inmates. Defendants maintained the policies, customs and practices set forth in paragraphs 61 - 70, that resulted in the injury and death of Mr. CABRERA.

WHEREFORE, Plaintiffs prays for judgment and relief against Defendants, and each of them, and DOES 1 - 10, jointly and severally, as described and limited in the Causes of Action set forth above, as follows:

1.   For general and compensatory damages in an amount according to proof;

2.   For special damages in an amount according to proof;

3.   For exemplary and punitive damages against individual Defendants in an amount according to proof;

4.   For costs of suit and reasonable attorneys' fees; and

5.     For such further relief as the court may deem just and equitable.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

Dated: June 25, 2012                By: _____/S/_____

DAVID S. McLANE

Attorneys for Plaintiff
REINA MARIBEL CAMPOS,
Individually, and  Successor in Interest to
STEVE ULYSSES CABRERA

THE LAW OFFICES OF BRIAN A.VOGEL, PC

Dated: June 25, 2012                By: _____/S/_____

BRIAN A. VOGEL

Attorneys for Plaintiff
BLANCA CARDENAS, Individually,
and Successor in Interest to
STEVE ULYSSES CABRERA,

## JURY DEMAND

Trial by jury of all issues is demanded.

Dated: June 25, 2012                By: _____/S/_____

DAVID S. McLANE

Attorneys for Plaintiff
REINA MARIBEL CAMPOS,
Individually, and  Successor in Interest to
STEVE ULYSSES CABRERA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE LAW OFFICES OF BRIAN A. VOGEL, PC

Dated: June 25, 2012            By: _____/S/_____
                                   BRIAN A. VOGEL

                                   Attorneys for Plaintiff
                                   BLANCA CARDENAS, Individually,
                                   and Successor in Interest to
                                   STEVE ULYSSES CABRERA

PROOF OF SERVICE

I, Veronica Aguilar, declare that I am a resident or employed in Los Angeles County, California; that my business address is 234 E. Colorado Blvd., Suite 230, Pasadena, California 91101; that I am over the age of eighteen years; that I am not a party to the above-entitled action; that I am employed in the Law Offices of KAYE, McLANE & BEDNARSKI, whose partners are members of the Bar of the United States District Court for the Central District of California, and at whose direction I served the:

## Second Amended Complaint For Damages

On June 25, 2012, following ordinary business practice, service was:

| [ ] Placed in a closed envelope, for collection and interoffice delivery addressed as follows: | [ ] By hand-delivery addressed as follows: | [X] Placed in a sealed envelope for collection and shipping via U.S. mail addressed as follows: |
|---|---|---|

[ ] By e-mail per agreement of parties as follows:
[ ] By facsimile as follows:

Tomas A. Guterres, Esq.
Collins Cloons Muir + Stewart LLP
1100 El Centro Street
South Pasadena, CA 91030

This proof of service is executed at Los Angeles, California, on June 25, 2012. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Veronica Aguilar